# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 20-327V
**Filed: April 9, 2026**

|  |  |
|---|---|
| ROBERT ALVARADO,<br><br>　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Special Master Horner |

*Jeffrey Gordon, Maney & Gordon, P.A., Tampa, FL, for petitioner.*
*Julianna Rose Kober, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On March 24, 2020, petitioner, Robert Alvarado, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa, *et seq.* (2012),[2] alleging that he suffers Bell's palsy as a result of the varicella vaccines he received on February 27, 2017, and April 5, 2017.  (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation.

## I.　　Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa–10, *et seq.*

showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991).

In this case, petitioner has alleged that the varicella vaccine caused him to suffer Bell's palsy. Because this alleged injury is not listed on the Vaccine Injury Table relative to this vaccine (or indeed any listed vaccine), petitioner must demonstrate causation-in-fact.

The showing of "causation-in-fact" must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. He need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for

the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id*.

A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1). A petitioner may rely upon circumstantial evidence. *See Althen*, 418 F.3d at 1280. Moreover, the *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. While scientific certainty is not required, that expert's opinion must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1). The special master is required to consider the entirety of the evidentiary record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

## I.    Procedural History

This action was previously assigned to Special Master Gowen in July of 2020, and he was the special master presiding over the case for much of its history. (ECF Nos. 17-18.) Due to his retirement, the case was reassigned to the undersigned by random assignment in February of 2026. (ECF Nos. 84-85.)

3

Petitioner filed his medical records, written statement, and a photograph between March and April of 2020, submitting his Statement of Completion on April 28, 2020 (ECF No. 12).  Respondent then filed his Rule 4(c) Report in December of 2020.  (ECF No. 24.)  Respondent argued that petitioner's medical records were inadequate to meet petitioner's preponderant burden of proof under the applicable *Althen* test.  (*Id*. at 12-13.)  Petitioner then filed an expert report by neurologist David Simpson, M.D.[3]  (ECF No. 30; Exs. 11-36.)  Respondent then filed a responsive expert report by neurologist Brian Callaghan, M.D.  (ECF No. 34; Exs. A-B.)  Petitioner then filed a report by immunologist Ronald Simon, M.D. (ECF Nos. 45, 47; Exs. 43-67),[4] and respondent responded with a report by immunologist You-Wen He, M.D., Ph.D. (ECF No. 48; Exs. C-D).  The parties then filed supplemental expert reports by Drs. Simon, Callaghan, and He.  (ECF Nos. 56, 58, 63, 68, 70; Exs. 68-75, Exs. E-G.)

An entitlement hearing was held on September 18, 2024, before Special Master Gowen.  (ECF No. 69; *see* Transcript of Proceedings ("Tr."), at ECF No. 80.)  Petitioner testified along with Drs. Simon, Callaghan, and He.  (Tr. 3.)  The parties presented their arguments in both pre- and post-hearing briefs.  (ECF Nos. 74, 76, 81, 83.)

## II.    Factual Summary

Petitioner was 38 years old at the time of the vaccinations at issue.  (*E.g*., Ex. 1, p. 77; Ex. 2, p. 12.)  The parties have stipulated that petitioner received varicella zoster vaccinations on February 27, 2017, and April 5, 2017.  (ECF No. 77, p. 1; *see also* Ex. 1, p. 77.)  They further stipulate that he presented to the emergency department at St. Joseph's Hospital, South Florida, with a complaint of right-sided facial paralysis starting the day before, on April 14, 2017, and that he was diagnosed with Bell's palsy on April 15, 2017.  (ECF No. 77, p. 1.; *see also* Ex. 3, pp. 13, 15, 17-18.)  This places the onset of petitioner's Bell's palsy approximately nine days after his April 5, 2017 vaccination. Bell's palsy is an injury to the seventh cranial nerve.  (Tr. 96.)  There are several distinct causes of injury to this cranial nerve; however, the term Bell's palsy is applied when the cause is unknown.  (*Id*.)

When petitioner later followed up with his primary care provider on April 25, 2017, he questioned whether his second varicella vaccination of April 5 had caused his Bell's palsy.  (Ex. 2, p. 685.)  His primary care provider did not record any opinion regarding petitioner's inquiry about the possibility of vaccine causation.[5]  (*Id*.)  Subsequently,

---

[3] All of the exhibits filed by petitioner up to this point were later struck for filing defects (ECF No. 29) and refiled in March of 2021 (ECF No. 30; Exs. 1-36.)  Of note, Exhibit designations 4-6 have not been used. (*See* ECF No. 30, p. 1.)

[4] These exhibits were also struck multiple times.  (ECF Nos. 39-44.)  Petitioner again skipped exhibit designations.  Although his most recently filed exhibit had been Exhibit 36, his subsequent filing began with Exhibit 43 (*compare* ECF No. 30, *with* ECF No. 47), accordingly Exhibit designations 37-42 were also not used.

[5] At first glance, the documentation in the medical record for this encounter suggests that petitioner's primary care provider agreed with petitioner's concern that his second varicella vaccine caused his Bell's palsy.  (*See* Ex. 2, p. 685.)  However, review of records for other encounters indicates that petitioner's primary care provider had a pattern of stating her agreement with the technician's documentation

however, petitioner was told by the military's Department of Health Affairs Immunization Healthcare Branch ("DHA-IHB") that a causal relationship between the varicella vaccine and Bell's palsy was "indeterminate (consistent temporal relationship but insufficient definitive evidence for vaccine causing the event)." (*Id*. at 620.)  He was advised to follow current guidelines for future vaccinations.  (*Id.*)

Beginning in May of 2017, petitioner additionally reported episodes of upper extremity "locking" and "jerking."  (Ex. 2, p. 1315.)  The following month, he reported that he had been experiencing this locking sensation for about a year.  (*Id.* at 1312.)  His neurologist felt he was experiencing tonic seizures, noting petitioner had a prior history of a febrile seizure when he was young.  (*Id.* at 1312-13, 1316.)  Although epilepsy was initially explored, an epilepsy specialist concluded he was experiencing intractable focal seizures of unknown etiology, which were not likely epileptic.  (Ex. 7, pp. 11-13.)  Respondent suggests this history may be relevant, at least insofar as it counters petitioner's suggestion that he was "neurologically asymptomatic" prior to vaccination (ECF No. 76-1, p. 37; ECF No. 83, p. 9); however, respondent does not point to any instance in the medical record where petitioner's treating providers felt his Bell's palsy and seizures were in any way connected.

It is not necessary to detail petitioner's full treatment history for his Bell's palsy to resolve the parties' disagreement as to vaccine causation, which primarily turns on general causation.

### III.    Expert Summaries

### a.  Neurologist David Simpson, M.D.,[6] for petitioner

Dr. Simpson submitted a single report.  (Ex. 11.)  He explains that, while the pathogenesis of Bell's palsy is poorly understood, it is thought to be caused by infectious agents, including Borrelia burgdorferi, Varicella zoster virus, and Herpes

---

regarding petitioner's relevant medical history.  (*E.g.*, *id.* at 658, 761, 778.)  Therefore, review of the record for petitioner's April 25 encounter indicates that his primary care provider was silent on the possibility of vaccine causation.  Petitioner's primary care provider also noted that petitioner should not be given another live virus vaccine until May 3, 2017 (*Id.* at 687); however, the reason for this is not specified.

[6] Dr. Simpson received his medical degree from SUNY at Buffalo School of Medicine in 1979.  (Ex. 12, p. 1.)  Thereafter, he completed an internship in internal medicine at University Hospitals of Cleveland, Case Western Reserve University; a residency in neurology at Cornell University Medical Center; and a fellowship in clinical neurology at Massachusetts General Hospital, Harvard Medical School.  (*Id.*)  Dr. Simpson is board-certified in neurology, with subspeciality certifications in clinical neurophysiology and neuromuscular medicine, and electrodiagnostic medicine.  (*Id.*)  He maintains his license to practice medicine in New York.  (*Id.*)  Dr. Simpson has held various academic appointments and is currently a Professor Neurology at Icahn School of Medicine at Mount Sinai.  (*Id.* at 2.)  Additionally, he is an attending physician at Mount Sinai Hospital where he also serves as Director of the Electromyography Laboratory, Director of the Neuromuscular Division, and Director of Clinical Neurophysiology Laboratories.  (*Id.*)  Dr. Simpson's specializes in the treatment of neuromuscular disorders, including a wide range of diseases of peripheral nerve and muscle.  (Ex. 11, p. 1.)  In his clinical practice, he has treated many patients with peripheral neuropathy, including Bell's palsy.  (*Id.*)

simplex virus.  (*Id*. at 5.)  Accordingly, autoimmune mechanisms are among the hypotheses for the condition, including molecular mimicry.  (*Id*. (citing M. Mañós-Pujol et al., *Etiopathogenesis of Bell's Palsy:  An Immune-Mediated Theory*, 1994 EUR. ARCHIVES OTORHINOLARYNGOLOGY S445 (Ex. 14)).)  Dr. Simpson proposes that immune antibodies and/or T cells could cross-react with epitopes on myelin or axonal glycoproteins, leading to neuronal damage.  (*Id*. (citing Thomas J. Safranek et al., *Reassessment of the Association Between Guillain-Barré Syndrome and Receipt of Swine Influenza Vaccine in 1976-1977:  Results of a Two-State Study*, 133 AM. J. EPIDEMIOLOGY 940 (1991) (Ex. 15); Michael C. Levin et al., *Neuronal Molecular Mimicry in Immune-Mediated Neurologic Disease*, 44 ANNALS NEUROLOGY 87 (1998) (Ex. 16)).) He cites GBS, and in particular GBS following the 1976 swine flu vaccination program, as a prime example of vaccination causing a demyelinating neurologic condition.  (*Id*. at 5-6 (citing Safranek et al., *supra*, at Ex. 15; Lawrence B. Schonberger et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977*, 110 AM. J. EPIDEMIOLOGY 105 (1979) (Ex. 19); INST. OF MED., *Influenza Vaccine: Guillain-Barré Syndrome*, *in* ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 321 (Kathleen Stratton eds., 2012) (Ex. 20)).)  Alternatively, vaccines might cause Bell's palsy via neurotoxic effect or by eliciting immune complexes leading to a vasculitis syndrome. (*Id*. at 5 (citing Maria Antonia Pou et al., *Development of Autoimmune Diseases After Vaccination*, 14 J. CLINICAL RHEUMATOLOGY 243 (2008) (Ex. 17)).)

Dr. Simpson cites two studies, one based on data from the U.S. Vaccine Adverse Event Reporting System ("VAERS") database and another from Switzerland, for the proposition that the flu vaccine has been associated with Bell's palsy.  (Ex. 11, p. 6 (citing Weigong Zhou et al., *A Potential Signal of Bell's Palsy After Parenteral Inactivated Influenza Vaccines:  Reports to the Vaccine Adverse Event Report System (VAERS)—United States, 1991-2001*, 13 PHARMACOEPIDEMIOLOGY & DRUG SAFETY 505 (2004) (Ex. 25); Margot Mutsch et al., *Use of the Inactivated Intranasal Influenza Vaccine and the Risk of Bell's Palsy in Switzerland*, 350 NEJM 896 (2004) (Ex. 26)).) He also cites additional papers to suggest that other vaccines, including hepatitis B, meningococcal conjugate, smallpox vaccine, and SARS-CoV-2, have been associated with Bell's palsy.  (*Id*. at 6-7 (citing Frederic E. Shaw Jr. et al., *Postmarketing Surveillance for Neurologic Adverse Events Reported After Hepatitis B Vaccination: Experience of the First Three Years*, 127 AM. J. EPIDEMIOLOGY 337 (1988) (Ex. 27); Handan Alp et al., *Bell's Palsy as a Possible Complication of Hepatitis B Vaccination in a Child*, 27 J. HEALTH, POPULATION & NUTRITION 707 (2009) (Ex. 28); James J. Sejvar et al., *Neurologic Adverse Events Associated with Smallpox Vaccination in the United States, 2002-2004*, 294 J. AM. MED. ASS'N 2744 (2005) (Ex. 29); Benjamin J. Song & Rohit K. Katial, *Update on Side Effects from Common Vaccines*, 4 CURRENT ALLERGY & ASTHMA REPS. 447 (2004) (Ex. 30); Claude Vital et al., *Postvaccinal Inflammatory Neuropathy:  Peripheral Nerve Biopsy in 3 Cases*, 7 J. PERIPHERAL NERVOUS SYSTEM 163 (2002) (Ex. 31); Hung-Fu Tseng et al., *Safety of Quadrivalent Meningococcal Conjugate Vaccine in 11- to 21-Year-Olds*, 139 PEDIATRICS 1 (2017) (Ex. 32); Al Ozonoff et al., *Bell's Palsy and SARS-CoV-2 Vaccines*, LANCET, Feb. 24, 2021, at 1 (Ex. 33)).)

While Dr. Simpson does not cite any papers specifically implicating the varicella vaccine as a cause of Bell's palsy, he explains that the varicella virus itself is associated with Bell's palsy.  (Ex. 11, pp. 5, 7.)  When the varicella virus causes Bell's palsy, it is known as "Ramsay Hunt syndrome."  (*Id.* at 7 (citing Mônica Alcantara de Oliveira Santos et al., *Varicella Zoster Virus in Bell's Palsy:  A Prospective Study*, 76 BRAZILIAN J. OTORHINOLARYNGOLOGY 370 (2010) (Ex. 34)).)  Moreover, he asserts that the varicella vaccine has been associated with neurologic complications more broadly, especially among the immunocompromised.  (*Id.* (citing Sandra S. Chaves et al., *Safety of Varicella Vaccine After Licensure in the United States:  Experience from Reports to the Vaccine Adverse Event Reporting System, 1995-2005*, 197 J. INFECTIOUS DISEASES S170 (2008) (Ex. 35)).)

In petitioner's case, Dr. Simpson explains that onset of Bell's palsy occurred within ten days of his April 5, 2017 varicella vaccination.  (Ex. 11, p. 8.)  Based on the Institute of Medicine's ("IOM's")[7] explanation of the timing for immune-mediated conditions, Dr. Simpson opines that this represents a medically acceptable timeframe for a causal inference implicating the varicella vaccination.  (*Id.* (citing INST. OF MED., *supra*, at Ex. 20).)  He further suggests that the two vaccines may have acted together, with the second vaccine providing a "booster" effect.  (*Id.*)  Additionally, he stresses that no other alternative explanation for petitioner's Bell's palsy is available.  (*Id.*)  Thus, he opines that a logical sequence of cause and effect supports petitioner's varicella vaccine as a substantial factor in causing his injury.  (*Id.*)

### a. Immunologist Ronald Simon, M.D.,[8] for petitioner

Dr. Simon submitted three reports in this case (Exs. 67, 68, 73) and also testified during the entitlement hearing (Tr. 42-90), wherein he was presented without objection as an expert in allergy and immunology (*Id.* at 47-49).  Consistent with Dr. Simpson's opinion, Dr. Simon opines that the onset of petitioner's Bell's palsy occurred in temporal relationship with his second varicella vaccination of April 5, 2017, and further, that the vaccine was the cause of the condition.  (Ex. 67, p. 3.)  Considering that onset of Bell's

---

[7] The Institute of Medicine (known as the National Academy of Medicine since 2015) is the medical arm of the National Academy of Sciences.  The National Academy of Sciences ("NAS") was created by Congress in 1863 to be an advisor to the federal government on scientific and technical matters (*see* An Act to Incorporate the National Academy of Sciences, ch. 111, 12 Stat. 806 (1863)), and the Institute of Medicine is an offshoot of the NAS established in 1970 to provide advice concerning medical issues.  When Congress enacted the Vaccine Act in 1986, it directed that the IOM conduct studies concerning potential causal relationships between vaccines and illnesses.  *See* § 300aa-1 note.

[8] Dr. Simon received his medical degree from the University of Health Sciences at Chicago Medical School.  (Tr. 43.)  Thereafter, he completed a residency in internal medicine at Northwestern University in Chicago and a fellowship in allergy and immunology at the Scripps Clinic in San Diego.  (*Id.* at 43-44.)  Dr. Simon is board-certified in internal medicine and allergy and immunology.  (Ex. 67, p. 1; Tr. 44.)  Currently, Dr. Simon is Emeritus Head of the Division of Allergy, Asthma, and Immunology at Scripps Clinic, where is also a senior consultant.  (Ex. 67, p. 1.)  Additionally, he is an adjunct professor and Skaggs scholar in the Department of Immunology and Microbiology at the Scripps Research Institute in La Jolla, California.  (*Id.*)  In his clinical practice, Dr. Simon treats adult and pediatric patients "with a wide gamut" of immune disorders.  (Tr. 45.)

palsy occurred after a second vaccine dose, Dr. Simon finds the timing of onset in this case to be "absolutely perfect" for a response to a vaccine booster. (Tr. 57.)

Dr. Simon suggests that, while the term Bell's palsy is commonly used to label cases of idiopathic facial paralysis, it is not synonymous with idiopathic facial paralysis. (Ex. 67, p. 3.) Instead, Dr. Simon opines that many cases of Bell's palsy are labeled as such due to lack of available clinical confirmation of the underlying cause, not because the condition actually is idiopathic. (*Id*.) According to Dr. Simon, most cases of facial palsy, including Bell's palsy, are explained by a viral inflammatory/immune mechanism, with Herpes simplex virus being the most common cause and herpes zoster infection the second most common cause. (*Id*. at 3-4 (citing Kedar Karim Adour et al., *Herpes Simplex Virus in Idiopathic Facial Paralysis (Bell Palsy)*, 233 J. AM. MED. ASS'N 527 (1975) (Ex. 45); Thomas Linder et al., *Bell's Palsy and Herpes Simplex Virus: Fact or Mystery?*, 26 OTOLOGY & NEUROLOGY 109 (2005) (Ex. 46); J. Richard Baringer, *Herpes Simplex Virus and Bell Palsy*, 124 ANNALS INTERNAL MED. 63 (1996) (Ex. 47); Jurjen Schirm & Paul S. J. Z. Mulkens, *Bell's Palsy and Herpes Simplex Virus*, 105 ACTA PATHOLOGICA, MICROBIOLOGICA, & IMMUNOLOGICA SCANDINAVICA 815 (1997) (Ex. 48); Shingo Murakami et al., *Bell Palsy and Herpes Simplex Virus: Identification of Viral DNA in Endoneurial Fluid and Muscle*, 124 ANNALS INTERNAL MED. 27 (1996) (Ex. 49); Erik Peitersen, *Bell's Palsy: The Spontaneous Course of 2,500 Peripheral Facial Nerve Palsies of Different Etiologies*, 549 ACTA OTOLARYNGOLOGICA SUPPLEMENTUM 4 (2002) (Ex. 50))); *see also* Tr. 60.) Other infectious causes include cytomegalovirus, Epstein-Barr virus, adenovirus, rubella virus, mumps, influenza B, and coxsackievirus. (Ex. 67, p. 4 (citing Michael Morgan & Dilip Nathwani, *Facial Palsy and Infection: The Unfolding Story*, 14 CLINICAL INFECTIOUS DISEASES 263 (1992) (Ex. 51)).) "This is important because it's not necessarily just an idiopathic disease, there are infectious causes of it . . . ." (Tr. 60.) However, the fact that Bell's palsy is caused by a variety of viruses means that "it's not the virus itself, some unique virus that damages the facial nerve, it's the person's immune response and the inflammation that ensues that does the damage to the facial nerve . . . ." (*Id*.)

Noting that the varicella vaccine is a live virus vaccine and that petitioner had no other infection, Dr. Simon proposes that "the immune response to this vaccine, in my opinion, [] led to the inflammation and subsequent demyelination that triggered [petitioner's] Bell's palsy." (Ex. 67, p. 4.) Explaining that that herpes zoster (Shingles) and varicella (Chickenpox) result from the same virus (varicella zoster virus or "VZV") (Ex. 68, p. 4), he opines this would occur via the same mechanism by which a natural herpes simplex and herpes zoster infection causes the condition (Ex. 67, p. 3; *see also* Ex. 73, pp. 2-3).[9] "Varivax[10] is a live varicella vaccine, so it results in the exact same kind of very robust inflammatory response as the natural infection, it just isn't infectious."

---

[9] Dr. Simon also cites alternative etiologies and risk factors for Bell's palsy, such as ischemia or diabetes, but explains why he does not believe they are relevant in this case. (Ex. 67, pp. 4-5.)

[10] In his initial report, Dr. Simon mistakenly stated that petitioner had received the Zostavax vaccine. (Ex. 67, p. 1.) However, in his first supplemental report, he corrected this error. (Ex. 68, pp. 1-2.)

(Tr. 61.) Ultimately, Bell's palsy most often follows infections with neurotrophic viruses of the herpes type, of which VZV is one. (Ex. 68, p. 4.) He explains:

> The histopathology of the facial nerve in patients with Bell's palsy is consistent with an inflammatory and possibly infectious cause, and the appearance is similar to that found with herpes zoster infection, further supporting an infectious hypothesis. Specifically, in Bell's Palsy, the facial nerve has a thickened, edematous perineurium with a diffuse infiltrate of small, round, inflammatory cells between nerve bundles and around intraneural blood vessels. Myelin sheaths undergo degeneration. These changes are seen throughout the bony course of the facial nerve, although nerve damage is maximal in the labyrinthine part of the facial canal where edema causes compression and the tenuous blood supply adds to the damage.

(Ex. 67, p. 4 (internal citations omitted) (citing Stephen L. Liston & Stephen Kleid, *Histopathology of Bell's Palsy*, 99 LARYNGOSCOPE 23 (1989) (Ex. 55)); *see also* Tr. 84-85.)

Although Varivax trials did not describe Bell's palsy as an adverse event, these trials almost exclusively included children whereas Bell's palsy is more likely to develop in adults. (Ex. 68, p. 4; *see also* Ex. 73, pp. 1-2.) Nonetheless, Bell's palsy has been reported in post marketing experience. (Ex. 68, p. 4 (citing Prescribing Information, Varivax (Varicella Virus Vaccine Live): Suspension for Subcutaneous Injection [hereinafter Varivax Package Insert] (Ex. 71)).) Dr. Simon also finds significance in the fact that other vaccines have been associated with Bell's palsy (Tr. 58), but in any event, citing the IOM, Dr. Simon stresses that not all issues can be resolved via epidemiology (Ex. 68, p. 4 (citing INST. OF MED., ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY (Kathleen Stratton eds., 2012) (Ex. 66; *see also* Ex. A, Tab 4)[11]). As Dr. Simpson had likewise noted, Dr. Simon stresses that Ramsay Hunt syndrome, which is known to be a major complication of varicella zoster virus reactivation in herpes zoster, demonstrates that the virus can cause ipsilateral facial paralysis. (*Id*.; *see also* Tr. 89-90.) Thus, it should not be surprising that the varicella vaccine can cause Bell's palsy. (Ex. 68, p. 4.)

In his initial report, Dr. Simon asserts that petitioner did not have any other risk factors for Bell's palsy. (Ex. 67, p. 5.) In his first supplemental report, he further explains that he disagrees with respondent's assertion that obesity is a risk factor for Bell's palsy. (Ex. 68, pp. 2-3.) Dr. Simon asserts that the Kim study cited by respondent's experts is a flawed study and is the only study available to make that assertion. (*Id*. (discussing So Young Kim et al., *Bell's Palsy and Obesity, Alcohol Consumption and Smoking: A Nested Case-Control Study Using a National Health*

---

[11] All four experts in this case provided as a reference the 2012 IOM report entitled: ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY. Drs. Simon and Callaghan both provided the entire report as a reference, and thus both parties filed the complete report as exhibits in this case. (Ex. 66, Ex. A, Tab 4.) However, Drs. Simpson and He only provided sections within the report as a reference, which were filed as separate exhibits by the parties. (Ex. 20; Ex. C, Tab 3.) Therefore, all four of these exhibits refer to the same 2012 IOM report.

*Screening Cohort*, Sci. Reps., Mar. 6, 2020, at 1 (Ex. 69; *see also* Ex. C, Tab 2; Ex. G, Tab 2)).)  However, even if one accepted that petitioner's obesity left him susceptible to Bell's palsy, the vaccine would remain a more likely cause, because (1) the obesity would not explain the temporal relationship of petitioner's Bell's palsy to his vaccination and because, (2) the vaccine explains petitioner's exposure to a type of virus known to cause Bell's palsy, (3) petitioner was not within the age cohort for which the Kim study found an increased risk of Bell's palsy in individuals with obesity,[12] and (4) the Kim study's conclusion was tentative (stating obesity "might" be an "indirect" risk factor). (Ex. 73, pp. 3-4 (citing Kim et al., *supra*, at Ex. 69).)

Dr. Simon summarizes his opinion as follows:

In summary, Bell's Palsy most often follows infections with neurotrophic viruses of the Herpes type.  In fact, Herpes [Z]oster (VZV), a Herpes type virus, is the #2 viral infection associated with Bell's palsy.  [Petitioner], as an adult (very unusual) received a LIVE virus immunization ("infection") with VZV and then developed [a] known VZV infection associated condition: Bell's palsy.  In my opinion, this was the result of the known [demyelinating] inflammatory response to the Herpes virus family, as has been demonstrated for Herpes Simplex, another neurotrophic Herpes virus.

(Ex. 68, p. 4.)

b.  Neurologist Brian Callaghan, M.D.,[13] for respondent

Dr. Callaghan submitted two reports (Exs. A, G) and also testified during the entitlement hearing (Tr. 92-140), wherein he was presented without objection as an expert in neurology and epidemiology (*Id.* at 94).

Dr. Callaghan likewise agrees that petitioner was appropriately diagnosed with Bell's palsy, the onset of which he places eight days post-vaccination.  (Ex. A, p. 4; Tr. 95-96.)  He agrees that this would be "in the ballpark" for an adverse reaction to a vaccination.  (Tr. 120-21.)  He also agrees that there was no evidence of infection around the time petitioner developed Bell's palsy.  (*Id.* at 119.)  However, he stresses

---

[12] The Kim study found an elevated risk among those over 40 whereas petitioner was 38 years old at the time of vaccination.  (Ex. 73, p. 4 n.2.)

[13] Dr. Callaghan received his medical degree from the University of Pennsylvania Medical Center.  (Ex. B, p. 1.)  Thereafter, he completed an internship in preliminary medicine and a residency in neurology at University of Pennsylvania Medical Center.  (*Id.*)  Upon finishing his residency, Dr. Callaghan went on to complete a neuromuscular fellowship at the University of Michigan Health System.  (*Id.*)  Additionally, at the University of Michigan, Dr. Callaghan earned a master's degree in clinical research design and statistical analysis and completed a fellowship with the Center for Healthcare Research and Transformation Policy.  (*Id.*)  He maintains his license to practice medicine in Michigan and is board-certified in neurology.  (*Id.*)  Currently, Dr. Callaghan is a professor of neurology at the University of Michigan and a staff physician at VA Ann Arbor Health System.  (Tr. 94; Ex. B, p. 2.)  He is also co-director of the Neuromuscular Division and associate program director of research for the neurology residency program at the University of Michigan.  (Tr. 93-94; Ex. B, p. 2.)  Dr. Callaghan has co-authored over 100 peer-reviewed publications and over 40 abstracts.  (Ex. B, pp. 12-18; Ex. A, p. 1.)  In his clinical practice, he specializes in neuromuscular diseases with a primary interest in patients with neuropathy, such as Bell's palsy.  (Ex. A, p. 1.)

that the cause of Bell's palsy is not known generally (*i.e.* it is idiopathic) and that no cause was found in petitioner's case.  (Ex. A, p. 4; Tr. 96-97, 136.)  Moreover, Dr. Simpson did not provide any evidence to support the potential mechanisms he had cited.  (Ex. A, p. 5.)  Absent evidence showing a causal mechanism, it is "really hard to comment on timing."  (Tr. 121-22.)

Noting in particular that Ramsay Hunt syndrome involves both the seventh and eighth cranial nerves (as opposed to Bell's palsy which affects just the seventh) and also involves a rash, Dr. Callaghan characterizes it as a distinct condition that is not informative of whether the varicella vaccine can cause Bell's palsy.  (Ex. A, p. 6; Tr. 98-99.)  According to Dr. Callaghan, the idea that Bell's palsy is caused by viruses remains "speculation."  (Tr. 96.)  Dr. Callaghan acknowledges that Bell's palsy patients have tested PCR positive for HSV-1 but suggests that the fact that a lot of people have been exposed to HSV-1 renders it "problematic" to draw a causal conclusion.  (*Id.* at 110.)  For example, he acknowledges that the Murakami study cited by petitioner is one such study; however, he opines it is "not the most rigorous design."  (*Id.* at 110-11 (discussing Murakami et al., *supra*, at Ex. 13).)

Dr. Callaghan agrees that the Mutsch study cited by Dr. Simpson found the flu vaccine to be associated with Bell's palsy; however, the finding was limited to the intranasal vaccine, with no association found parenteral vaccination.  (Ex. A, pp. 4-5 (citing Mutsch et al., *supra*, at Ex. 26).)  He cites several other publications for the proposition that investigations found no association between Bell's palsy and various vaccinations, including the pneumococcal vaccine, hepatitis B vaccine, and multiple formulations of the flu vaccine.  (*Id.* at 5 (citing Julia Stowe et al., *Bell's Palsy and Parenteral Inactivated Influenza Vaccine*, 2 HUM. VACCINES 110 (2006) (Ex. A, Tab 1); Ali Rowhani-Rahbar et al., *Immunization and Bell's Palsy in Children: A Case-Centered Analysis*, 175 AM. J. EPIDEMIOLOGY 878 (2012) (Ex. A, Tab 2); Leonoor Wijnans et al., *Bell's Palsy and Influenza(H1N1)pdm09 Containing Vaccines: A Self-Controlled Case Series*, PLOS ONE, May 3, 2017, at 1 (Ex. A, Tab 3)); Tr. 106-110.)  Moreover, he stresses that the IOM's 2012 report concluded that the evidence favored a rejection of an association between the flu vaccine and Bell's palsy.[14]  (Ex. A, p. 5 (discussing INST.

---

[14] Special masters have previously observed that the IOM employs a standard for finding causation that is higher than what is required by petitioner's burden of proof.  *E.g.*, *Raymo v. Sec'y of Health & Human Servs.*, No. 11-0654V, 2014 WL 1092274, at *21 n.39 (Fed. Cl. Spec. Mstr. Feb. 24, 2014).  Accordingly, IOM reports and findings are typically approached with caution and generally not treated as dispositive.  *Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1252 (Fed. Cir. 2011) (noting the special master's comment that "IOM reports are favored, although not dispositive, in the Vaccine Program," then affirming special master's decision).  However, numerous prior cases have demonstrated that special masters may account for IOM findings in reaching their decisions.  *See*, *e.g.*, *Crutchfield v. Sec'y Health & Human Servs.*, 125 Fed. Cl. 251, 262 (2014) (noting that "it was appropriate for the special master to consider the medical literature presented, including the IOM report" and that "the court often has relied on the findings of the Institute of Medicine"); *see also Isaac v. Sec'y Health & Human Servs.*, 108 Fed. Cl. 743, 755-56 (2013) (affirming the special master's reliance on findings of the IOM), *aff'd per curiam,* 540 F. App'x 999  (Fed. Cir. 2013); *Cucuras*, 993 F.2d at 1529 (noting that the special master had placed "a great deal of weight" on an IOM report in reaching a decision, then affirming the special master's decision); *Stroud v. Sec'y Health & Human Servs.*, 113 F.3d 1258 (Fed. Cir. 1997) (unpublished table decision) (affirming the special master's reliance upon an IOM report that neither party filed as evidence).

OF MED., *supra*, at Ex. A, Tab 4).)  Although the IOM did not specifically examine whether the varicella vaccine can cause Bell's palsy, Dr. Callaghan notes that it did conclude that there is insufficient evidence to implicate it as a cause of other peripheral neuropathies, such as GBS and small fiber neuropathy.  (*Id.* (discussing INST. OF MED., *supra*, at Ex. A, Tab 4); Tr. 102-03, 105-06.)  Dr. Callaghan does not find Dr. Simpson's reliance on papers relating to other vaccines to be persuasive.  (Ex. A, pp. 5-6.)  Nor does he agree that the ability of the flu vaccine to cause GBS is informative.  (*Id.* at 5; Tr. 97-98, 103-04.)

Although Dr. Simon suggested that Bell's palsy is more common in adults (whereas the varicella vaccine is usually given to children), Dr. Callaghan submits both that Bell's palsy has an incidence rate of greater than six cases per 100,000 person-years among children under 14 years of age and that adults do receive the varicella vaccine.  (Ex. G, p. 1 (citing Xiuqin Xiong et al., *Cost-Effectiveness of Prednisolone to Treat Bell Palsy in Children*, 100 NEUROLOGY e2432 (2023) (Ex. G, Tab 1)).)  Thus, he opines that the lack of any association between the varicella vaccine and Bell's palsy is meaningful.  (*Id.*)  Moreover, studies related to other vaccinations (*i.e.* the above cited Mutsch, Stowe, Rowhani-Rahbar, and Wijnans papers) finding no association are further reassuring.  (*Id.*)  The Rowhani-Rahbar study in particular examined Bell's palsy among children.  (Tr. 109-110 (discussing Rowhani-Rahbar et al., *supra*, at Ex. A, Tab 2).)  However, Dr. Callaghan agrees as a general matter that live vaccines have a higher risk of side effects.  (*Id.* at 133.)

The lack of evidence suggesting the varicella vaccine is a risk factor for Bell's palsy stands in contrast to the evidence supporting obesity as a risk factor for the condition.  (Ex. G, p. 1 (citing Kim et al., *supra*, at Ex. G, Tab 2).)  "While we do not know whether obesity was the precise cause of Bell's palsy in this particular case, we do know that obesity increased the risk of the petitioner developing Bell's palsy and that vaccinations do not increase the risk."  (*Id.*; *see also* Tr. 97, 136.)

### c.  Immunologist You-Wen He, M.D., Ph.D.,[15] for respondent

Dr. He submitted three reports (Exs. C, E, F) and also testified during the entitlement hearing (Tr. 143-195), wherein he was admitted without objection as an expert in immunology (*Id.* at 146).  Dr. He explains that

[t]he time between [petitioner's] 2nd varicella vaccination and his Bell's palsy onset indeed falls into the 42 days of timeframe set forth by the IOM Committee.[16]  However, other than this temporal relationship, there is no

---

[15] Dr. He received his medical degree from The Fourth Military Medical University in Xian, China, and his Ph.D. in microbiology and immunology from the University of Miami School of Medicine.  (Ex. D, p. 1.)  Currently, Dr. He is a professor of immunology in the Department of Immunology at Duke University Medical Center.  (*Id.*; Tr. 144.)  His research focuses on both innate and adaptive immunity against viral and bacterial infections as well as tumors.  (Ex. C, p. 1.)  Dr. He has co-authored over 100 publications.  (Ex. D, pp. 8-17.)

[16] In his preceding report, Dr. Simpson had stated that "[t]he Institute of Medicine has accepted the timing of an immune-mediated response following vaccination up to 42 days after vaccination."  (Ex. 11, p. 8.)  The supporting citation for this statement was to an excerpt of the IOM's 2012 report specifically

other evidence to support a logical sequence of cause and effect showing that the Varicella vaccine was the cause of [petitioner's] Bell's Palsy.

(Ex. C, p. 11; *see also* Tr. 169-70.)

Moreover, Dr. He opines that petitioner's obesity, which left him with a higher than 2.00 odds ratio to develop Bell's palsy, is an "important alternative explanation." (Ex. C, p. 11. (citing Kim et al., *supra*, Ex. C, Tab 2)); *see also* Ex. E, p. 4.)  Initially, Dr. He opined that "obesity alone is a very significant risk factor for Bell's palsy development" and that petitioner's obesity "likely contributed to his Bell's palsy without the need for the receipt of a vaccine stimulation."  (Ex. F, pp. 2-3.)  During the hearing however, Dr. He ultimately agreed that he cannot opine to a reasonable degree of medical certainty that petitioner's obesity caused his Bell's palsy.  (Tr. 192.)  In fact, he agreed that he cannot rule out the possibility that petitioner's obesity left him more susceptible to an immune stimulus such as a vaccine.  (*Id.* at 166.)

In contrast to Dr. Callaghan's unwillingness to allow that infectious causes of Bell's palsy move beyond speculation, and though noting the cause of Bell's palsy is not yet established, Dr. He summarizes the pathogenesis of Bell's palsy as follows:

> Several other suspected sources of inflammation at the facial nerve have been implicated in the pathogenesis of Bell's palsy including herpes simplex virus activation, inflammatory responses to other viral infections such as herpes zoster, cytomegalovirus, Epstein-Barr virus, adenovirus, rubella virus, mumps, influenza, coxsackievirus, rickettsial infection, and SARS-CoV-2.  Alternative postulated noninfectious factors include: facial nerve ischemia, diabetes, inflammatory response to an inactivated intranasal influenza vaccine that was used in 2000 in Switzerland (and had been since withdrawn from the market).

(Ex. C, p. 4 (internal citations omitted) (citing Michael Ronthal & Patricia Greenstein, *Bell's Palsy: Pathogenesis, Clinical Features, and Diagnosis in Adults*, UPTODATE, https://www.uptodate.com/contents/bells-palsy-pathogenesis-clinical-features-and-diagnosis-in-adults (last updated Apr. 28, 2022) (Ex. C, Tab 1)).)

Dr. He does not dispute that the varicella zoster virus is within the herpes simplex family of viruses.  (Tr. 149.)  He also agrees as a general matter that vaccines can cause autoimmune disease.  (*Id.* at 172.)  However, he stresses that there is no evidence associating the varicella vaccine to Bell's palsy.  (Ex. C, pp. 4-5.)  Dr. He cites multiple publications as confirmation of a lack of data to implicate the varicella vaccine as a cause of Bell's palsy and also notes that his own PubMed search did not reveal any relevant publications.  (*Id.* (citing INST. OF MED., *Varicella Virus Vaccine*, *in* ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 239 (Kathleen Stratton eds., 2012) (Ex. C, Tab 3); Matthew Z. Dudley et al., *The State of Vaccine Safety Science: Systematic Reviews of the Evidence*, 20 LANCET e80 (2020) (Ex. C, Tab 4); Margaret A. Maglione et al., *Safety of Vaccines Used for Routine Immunization of US Children: A Systematic*

---

regarding GBS.  (INST. OF MED., *supra*, at Ex. 20.)  However, Dr. He's quoted statement nonetheless accepts Dr. Simpson's use of this time frame for Bell's palsy.

*Review*, 134 PEDIATRICS 325 (2014) (Ex. C, Tab 5); Agency for Healthcare Rsch. & Quality, Safety of Vaccines Used for Routine Immunization in the United States, at 1 (unpublished manuscript) (Ex. C, Tab 6)).)

Dr. He further suggests that Dr. Simon conflates the live, attenuated virus contained in the Varivax vaccine with a wildtype virus, which is incorrect. (Ex. E, pp. 2-3.) "[A]ny argument of vaccine causation that relies on a comparison of attenuated vaccines, which have been used for many years, to active infections, is not supported by any scientific or clinical evidence." (*Id.* at 3; *see also* Tr. 152-54.) Dr. He opines that the Varivax vaccine is "really a safe attenuated vaccine." (Tr. 154.) And, while he agreed during the hearing that the lack of equivalence between a live virus and a vaccine is not dispositive, he stressed that "when we talk about what cause[s] autoimmune disease, we really need to deeply look at how strong the immune response in activation can break [the] many layers of regulatory mechanisms." (*Id.* at 154-55.) However, he agreed that the live attenuated virus within the Varivax vaccine does replicate in the body, that the vaccine stimulates both the innate and adaptive immune responses, and that the two-dose series is intended to produce a stronger immune response. (*Id.* at 181-82.)

## IV.    Analysis

As discussed above, petitioner's burden of proof in a cause-in-fact claim is to meet the three-part *Althen* test, which includes (1) a general theory of causation implicating the vaccine as a cause of the alleged condition, (2) a logical sequence of cause and effect implicating the vaccination as a cause of petitioner's own condition, and (3) appropriate timing of onset based on the theory of causation. 418 F.3d at 1278. In this case, the parties present issues with respect to all three *Althen* prongs.

### a.    *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," demonstrating that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004)). Such a theory must only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [his] theory." *Boatmon*, 941 F.3d at 1359 (quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010)). "While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Id.* (quoting *Knudsen*, 35 F.3d at 548-49).

The undersigned is not aware of any prior adjudication of a case alleging that the varicella vaccine caused Bell's palsy. However, petitioners have previously been compensated for Bell's palsy that resulted from two other vaccines, the flu vaccine and

14

the hepatitis B vaccine. *Arredondo v. Sec'y of Health & Human Servs.*, No. 18-1782V, 2023 WL 8181138 (Fed. Cl. Spec. Mstr. Oct. 31, 2023) (flu vaccine); *Sturdevant v. Sec'y of Health & Human Servs.*, No. 17-172V, 2022 WL 3369716 (Fed. Cl. Spec. Mstr. July 19, 2022) (flu vaccine), *mot. for rev. denied*, 171 Fed. Cl. 537 (2024); *Beraki v. Sec'y of Health & Human Servs.*, No. 17-243V, 2021 WL 4891119 (Fed. Cl. Spec. Mstr. Sept. 20, 2021) (hepatitis B vaccine). *But see Decastro v. Sec'y of Health & Human Servs.*, No. 17-1973V, 2024 WL 1087631 (Fed. Cl. Spec. Mstr. Feb. 16, 2024) (the undersigned finding petitioner had not preponderantly demonstrated the hepatitis B vaccine can cause Bell's palsy).

Although the prior rulings finding Bell's palsy compensable involved different vaccines, they are persuasive on several broader points. First, while the *Arredondo* ruling was primarily informed by analogy to GBS, 2023 WL 8181138, at *26-28, (similar to the theory initially presented by Dr. Simpson) which I find less relevant in this case, both the *Sturdevant* and *Beraki* rulings accepted the basic premise of Bell's palsy etiology that has likewise been presented in this case by Dr. Simon. *Sturdevant*, 2022 WL 3369716, at *27; *Beraki*, 2021 WL 4891119, at *15. That is, these prior rulings agree that Bell's palsy can manifest as a post-viral process wherein an inflammatory response to infection results in inflammation and swelling of the seventh cranial nerve that leads to compression and paralysis where the nerve travels through the narrow bony canal of the temporal bone. *Sturdevant*, 2022 WL 3369716, at *27; *Beraki*, 2021 WL 4891119, at *15. And, significantly, respondent's immunology expert, Dr. He, has not disputed this point. In fact, both he and Dr. Simon similarly describe the likely pathogenesis of Bell's palsy as a post-infectious inflammatory process. (Ex. 67, pp. 3-4; Ex. C, p. 4.) Second, these rulings conclude that the lack of epidemiology is not dispositive in the context of this alleged injury. *Sturdevant*, 2022 WL 3369716, at *28; *Beraki*, 2021 WL 4891119, at *16. And, third, these rulings stand for the general proposition that it is reasonable to hypothesize that the immune response to the vaccines at issue can act in the same manner as a natural infection to cause Bell's palsy. *See Sturdevant*, 2022 WL 3369716, at *26-28; *Beraki*, 2021 WL 4891119, at *15-16. I agree with all of these points and find that they are applicable on the instant record.

Notwithstanding the above, Dr. He maintains that "any argument of vaccine causation that relies on a comparison of attenuated vaccines, which have been used for many years, to active infections, is not supported by any scientific or clinical evidence." (Ex. E, p. 3; *see also* Tr. 152-54.) However, this aspect of Dr. He's opinion has the effect of elevating petitioner's burden of proof. In particular, in contrast to Dr. He's position, the IOM (which he himself otherwise cited as authoritative) indicates that as a general matter, the effects of the natural infection is one type, "albeit minor," of evidence supportive of a mechanism of causation. (INST. OF MED., *supra*, at Ex. A, Tab 4, p. 42.) Moreover, the IOM concluded that there is sufficient mechanistic evidence available to support a causal relationship between the varicella vaccine and disseminated vaccine-strain varicella via direct viral infection, though other organ involvement was limited to the immunocompromised. (INST. OF MED., *supra*, at Ex. C, Tab 3, pp. 10-11.)

Further to this, I find petitioner persuasive in stressing that the varicella zoster virus can cause paralysis of the seventh cranial nerve in the context of Ramsay Hunt

syndrome.  Although Dr. Callaghan stresses that Ramsay Hunt syndrome itself is not limited to the seventh cranial nerve and also generally includes a rash (Ex. A, p. 6; Tr. 98-99), this does not reasonably undermine the observation that the varicella zoster virus can cause paralysis of the seventh cranial nerve.  Dr. Callaghan agrees that Ramsay Hunt syndrome does encompass injury to the seventh cranial nerve, the same injury that constitutes Bell's palsy.  (Ex. A, Tab 6; Tr. 98-99.)  Moreover, Dr. He agreed that the herpes family of viruses are implicated as a cause of Bell's palsy.  (Tr. 176-77.)

Although I would not accept a parallel to natural infection standing alone as sufficient to meet petitioner's burden of proof, *e.g.*, *Gaskin v. Sec'y of Health & Human Servs.*, No. 21-835V, 2025 WL 786306, at *11-12 (Fed. Cl. Spec. Mstr. Feb. 11, 2025), petitioner's presentation is not so limited.  Petitioner has demonstrated: (1) that Bell's palsy has a likely post-infectious inflammatory etiology; (2) that vaccines in general can cause post-infectious autoimmune disease; (3) that at least one vaccination (an intranasal flu vaccine) has been clearly implicated as a cause of Bell's palsy; (4) that the herpes family of viruses more broadly are likely causes of Bell's palsy; (5) that the virus contained within the varicella vaccine more specifically can cause facial paralysis of the seventh cranial nerve in the context of Ramsay Hunt syndrome; and (6) that as a live virus vaccine, the varicella vaccine is capable of resulting in dissemination of vaccine strain virus.  All of these points, though circumstantial, add up collectively to a legally probable, though not scientifically certain, showing that the varicella vaccine can cause Bell's palsy.

In light of the above, and considering the record as a whole, I conclude that petitioner has met his preponderant burden of proof with respect to *Althen* prong one.

### b. *Althen* prong three

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged.  *Althen*, 418 F.3d at 1278.  That term has been equated to the phrase "medically-acceptable temporal relationship."  *Id.* at 1281.  A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact."  *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).  The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement).  *Id.*; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom. C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom. Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Petitioner argues in his post-hearing brief that respondent's immunology expert, Dr. He, conceded during the hearing that the timing of onset in this case is medically appropriate, thereby satisfying his burden of proof under *Althen* prong three.  (ECF No. 81, pp. 1-2 (citing Tr. 169).)  Respondent disagrees.  (ECF No. 83, pp. 9-10.)  However,

16

based on my review of the record, petitioner is correct to suggest that *Althen* prong three has never been meaningfully challenged in this case.

> Dr. He testified as follows:

> THE COURT:  But you would agree, would you not, that even though the temporal relationship standing by itself doesn't prove causation, that when we're talking about nine or 10 days after the receipt of vaccination, that is in the range of which you would expect an immune response and even [an] autoimmune response to occur.  Wouldn't you agree with that?

> THE WITNESS: Yes, indeed.  If – if, you know, this is caused by an autoimmune attack, yeah, it would be in the appropriate timeframe.

(Tr. 169; *see also* Ex. C, p. 11 (accepting that a temporal relationship is present based on a 42-day onset period).)  Dr. Callaghan also similarly testified that onset is "in the ballpark" for an adverse vaccine reaction.  (Tr. 120-21.)

Because petitioner has met his burden of proof with respect to *Althen* prong one, this testimony demonstrates that he has also met his burden under *Althen* prong three. Although respondent continues to argue as an extension of his arguments relative to *Althen* prong one that petitioner necessarily cannot meet his *Althen* prong three, his experts have repeatedly declined to raise any argument that the timing of onset in this particular case represents an *additional* confounding factor.

In light of the above, and considering the record as a whole, I conclude that petitioner has met his preponderant burden of proof with respect to *Althen* prong three.

### c.  *Althen* prong two

Under the first *Althen* prong, petitioner must present a general medical theory explaining that the vaccine in question "can" cause the type of injury in question. *Pafford*, 451 F.3d at 1355-56.  However, under the second and third prongs, petitioner must also present evidence that the vaccine "did" cause petitioner's own injury.  *Id*.  As discussed above, the third prong asks whether the timing of injury in this specific case aligns with what would be expected under the general theory presented under *Althen* prong one.  *Id.* at 1358.  The second *Althen* prong further requires preponderant proof of a logical sequence of cause and effect, which is usually supported by facts derived from petitioner's medical records.[17]  *Althen*, 418 F.3d 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148.  While the opinions of

---

[17] Medical records are generally viewed as trustworthy evidence.  *Cucuras*, 993 F.2d at 1528.  These records are generally contemporaneous to the medical events and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  *Id.*  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master.  § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) (reasoning that "nothing . . . mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

17

treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a cause-in-fact claim through presentation of either medical records or an expert medical opinion.  *See* § 300aa-13(a).

The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning," but has also indicated that satisfaction of *Althen* prongs one and three is probative with respect to *Althen* prong two.[18]  *Capizzano*, 440 F.3d at 1326-27. Nonetheless, temporal association alone is not enough to satisfy petitioner's burden of proof.  *See, e.g., Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal  relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom. Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012).

In this particular case, although the DHA-IHB advised petitioner that no causal relationship was established (Ex. 2, p. 620), this does not defeat petitioner's showing under *Althen* prong two for two reasons.  First, the DHA-IHB acknowledged the temporal relationship without entirely ruling out the vaccine as casual.  (*Id.*)  Second, and relatedly, the DHA-IHB's explanation makes it clear that this assessment applied an evidentiary standard that exceeds petitioner's burden of proof in this program. Specifically, whereas petitioner bears a preponderant burden of proof in this case, the causal relationship was deemed "indeterminate" by DHA-IHB because there was "insufficient *definitive* evidence for vaccine causing the event."  (*Id.* (emphasis added).) Petitioner's medical records are otherwise largely silent as to the cause of his condition. For example, when petitioner presented to his primary care provider on April 25, 2017, he inquired about whether his second varicella vaccination could have caused his Bell's palsy.  (Ex. 2, p. 685.)  However, the resulting medical record is silent as to the provider's view as to vaccine-causation.  (*See* Ex. 2, pp. 685-88; *see also* n. 5, *supra*.) Instead, petitioner supports a logical sequence of cause and effect via his experts' opinions, which I have credited.

---

[18] The *Capizzano* Court described the circumstances in which *Althen* prong two may be a stumbling block as follows:

> There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine.  A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving the vaccine caused the injury by preponderant evidence.

440 F.3d at 1327.

Respondent raises several additional concerns relative to *Althen* prong two. (ECF No. 83, pp. 6-9.)  Respondent argues that petitioner's expert relies entirely on temporality whereas Bell's palsy can, and often does, have an idiopathic etiology.  (*Id*. at 7-8 (citing Ex. 73, pp. 3-4; Ex. 67, p. 5).)  Moreover, the overall incidence rate for Bell's palsy is such that some development of disease coincident to vaccination should be expected.  (*Id*. at 8 (citing Ronthal & Greenstein, *supra*, at Ex. C, Tab 1, p. 3; Stowe et al., *supra*, at Ex. A, Tab 2, p. 1).)  Additionally, petitioner's obesity is a risk factor for the development of Bell's palsy.  (*Id*. (citing Kim et al., *supra*, at Ex. C, Tab 2, pp. 1-2).)  And, finally, respondent finds unspecified significance in the fact that petitioner had other abnormal neurologic symptoms around the time of the onset of his Bell's palsy. (*Id*. at 9 (citing Ex. 7, p. 7; Ex. 2, p. 1290).)

However, none of respondent's arguments are persuasive.  First, respondent has not substantiated his suspicion that petitioner's other neurologic condition is related to his Bell's palsy.  Not only is this purported connection not reflected in the medical records, but respondent has also not cited any statement by his own experts to support the notion that petitioner's other conditions are relevant.  (ECF No. 83, p. 9.) Additionally, petitioner is persuasive in noting that during the hearing, respondent's own experts agreed that, though they opine obesity is a risk factor for Bell's palsy, they cannot opine that it was a more likely than not cause in this particular case.  (ECF No. 81, p. 2; Tr. 136, 192.)  Absent these other considerations, neither the fact that Bell's palsy can present idiopathically nor the overall incidence rate necessarily counsels that this petitioner's Bell's palsy is merely coincident to vaccination.  *Accord Capizzano*, 440 F.3d at 1326 (explaining that "the immense number of people receiving the hepatitis B vaccine statistically results in instances where individuals suffer an initial onset of rheumatoid arthritis shortly after receiving the vaccine . . . However, the statute requires only that the claimant show that it is more likely than not that *this claimant's* RA was caused by the vaccine").

In light of the above, and considering the record as a whole, I conclude that petitioner has met his preponderant burden of proof with respect to *Althen* prong two.

### a. Factor unrelated to vaccination

Once petitioner has met his own prima facie burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination.  § 300aa-13(a)(1)(B); *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013).  In order to meet his burden, respondent must demonstrate by preponderant evidence "that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)."  *de Bazan*, 539 F.3d at 1354 (emphasis omitted).  Here, however, respondent has not presented any such argument. (ECF Nos. 76, 83.)  And, indeed, Dr. Callaghan testified on respondent's behalf that the cause of petitioner's Bell's palsy is unknown.  (Tr. 136.)

19

II.    **Conclusion**

   After weighing the evidence of record within the context of the Vaccine Program, I find by preponderant evidence that petitioner suffered Bell's palsy caused-in-fact by the varicella vaccination he received on April 5, 2017.  A separate damages order will be issued.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master